# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Paul E. Plunkett | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 9190 | **DATE** | 7/12/2004 |
| **CASE TITLE** | Kimberly Flanagan vs. Cook Co. Adult Probation Dept. et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment (18-1) is granted in part and denied in part..

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | JUL 1 3 2004 | |
| | Notified counsel by telephone. | | date docketed | 34 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 7/12/04 | |
| | | 2004 JUL 12 PM 5: 08 | date mailed notice | |
| CW | courtroom deputy's initials | FILED-EDT Date/time received in central Clerk's Office | cw mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**
JUL 1 3 2004

| | |
|---|---|
| KIMBERLY FLANAGAN, | |
| Plaintiff, | |
| v. | No. 02 C 9190 |
| | Paul E. Plunkett, Senior Judge |
| OFFICE OF THE CHIEF JUDGE OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Kimberly Flanagan has sued the Office of the Chief Judge of the Circuit Court of Cook County ("the County") for its alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. The County has filed a Federal Rule of Civil Procedure ("Rule") 56(c) motion for summary judgment. For the reasons set forth below, the motion is granted in part and denied in part.

### The Legal Standard

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). At this stage, we do not weigh evidence or determine the truth of the matters asserted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). We view all

34

evidence and draw all inferences in favor of the non-moving party. Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. Id.

## Background[1]

Plaintiff, an African-American woman, was hired by the County to work as an adult probation officer in its Home Confinement Unit on February 16, 1999. (Def.'s LR 56.1(a) Stmt. ¶¶ 3-4.) Adult probation officers assigned to that unit are required to carry firearms. (Id. ¶ 6; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 2.) To qualify to do so, however, they must first complete classroom, field and weapons training and pass psychological and drug tests. (Def.'s LR 56.1(a) Stmt. ¶¶ 7-9.) After she was hired, plaintiff successfully completed all training and tests. (Id. ¶ 10.)

On April 20, 2000, plaintiff was notified that she had to attend mandatory annual weapon requalification. (Id. ¶ 13.) Plaintiff attended the requalification program on May 9, 2000. (Id. ¶ 15.) Her requalification supervisors were Guy Wilson, Steve Glazier and Rich Martin. (Id. ¶ 16.) Plaintiff did not achieve a passing score of 70% on either of her two attempts to requalify. (Id. ¶ 18.)

According to the annual weapons requalification protocol, an officer who fails her first two attempts to requalify must attend remedial weapons training. (Id. ¶ 21.) Plaintiff attended remedial training on June 19, 2000, where she received instruction from firearms instructor Frank Petrone. (Id. ¶ 24; Pl.'s LR 56.1(b)(3)(A) Stmt. ¶ 24.) Usually, the third and fourth requalification attempts are made on the same day as the remedial training. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 15.)

---

[1] Unless indicated otherwise, the following facts are undisputed.

-2-

Plaintiff says that, after some practice rounds, Petrone told her the next one would be her qualifying shoot. (Id. ¶ 17.) Plaintiff says she scored 80% on the next round, prompting Petrone to say that he couldn't believe a woman could shoot that well. (Id. ¶¶ 17-18.) When Petrone told her to shoot again, plaintiff says, she scored 90%. (Id. ¶ 19.) At that point, Petrone told her all of that day's rounds would be considered practice. (Id. ¶ 20.)

On June 27, 2000, plaintiff made two more attempts to requalify under Petrone's supervision. (Def.'s LR 56.1(a) Stmt. ¶ 26.) Plaintiff says she passed, having achieved scores of 80% on each attempt. (Pl.'s LR 56.1(b)(3)(A) Stmt. ¶ 27.) Petrone, however, recorded her scores as 68% and 48%, respectively. (Def.'s LR 56.1(a) Stmt. ¶ 27.) Petrone told her that she could not keep the copy of her silhouettes showing her scores because they were County property, though there is no policy forbidding instructors from giving silhouettes to officers after they have been scored. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 25-26.)

Plaintiff complained about the requalification session to Assistant Chief Cunningham. (Id. ¶ 28.) Cunningham talked to Petrone, who said that plaintiff had not requalified on June 27, and that the 80% and 90% rounds she shot on June 19 were just practice shots. (Id. ¶ 29.) Cunningham testified that he independently scored the silhouettes from plaintiff's June 27 rounds and concluded that she had failed. (Id. ¶ 33.) Petrone, however, said that he destroyed those silhouettes after grading them. (Id. ¶ 34.)

The weapons requalification protocol gives officers five attempts to requalify. (Def.'s LR 56.1(a) Stmt. ¶ 28.) Plaintiff took her fifth try on July 21, 2000, again under Petrone's supervision. (Id. ¶ 29.) Though Petrone recorded her score as 56%, plaintiff says she actually scored over 80% on this attempt. (Id. ¶ 30; Pl.'s LR 56.1(b)(3)(A) Stmt. ¶ 30.)

After this requalification session, plaintiff again spoke to Cunningham. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 42.) She told him that Petrone was incorrectly scoring her shoots and lying on her training record. (Id.) She told Cunningham that she wanted other instructors present when she was qualifying. (Id.) Plaintiff also submitted a grievance about the situation to her union on August 12, 2000. (Id. ¶ 45.)

Cunningham obtained permission for plaintiff to take another remedial training program and to take two more requalification tests. (Def.'s LR 56.1(a) Stmt. ¶ 32.) On August 16, 2000, plaintiff once again attended remedial training under the supervision of Fred Hill, Cindy Komar and Matt Sobieski. (Id. ¶ 35.) After what plaintiff viewed as an excessive number of practice rounds, she shot two qualifying rounds, scoring 58% and 48%, respectively. (Id. ¶ 36; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 49.) Plaintiff says the instructors made her shoot those qualifying rounds, despite the fact that the prolonged practice sessions had impaired her ability to shoot. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 51, 53.)

In mid-September 2000, Cunningham met with plaintiff and her union representatives. (Def.'s LR 56.1(a) Stmt. ¶ 38.) Cunningham explained that, as a result of her failure to requalify to carry a weapon, plaintiff would be involuntarily transferred to a non-weapon carrying unit, which would result in a decrease in plaintiff's pay, for one year. (Id. ¶¶ 39-40; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 58.) After the year was up, she could once again try to qualify to carry a gun. (Def.'s LR 56.1(a) Stmt. ¶ 41.) Cunningham told her that she would be transferred to the Domestic Violence Unit because of her background in social work and psychology. (Id. ¶ 43.) Plaintiff was transferred October 10, 2000. (Id. ¶ 44.)

In November 2001, plaintiff passed the weapons requalification test and requested a transfer to the Intensive Probation Services Unit ("Probation Unit"), a weapon-carrying unit. (Id. ¶ 53.) The County told her that there were no positions available in the Probation Unit at that time. (Pl.'s LR 56.1(b) Stmt., Ex. 1, Flanagan Dep. at 193-94).

In July 2002, plaintiff was notified that she was going to be transferred to the Probation Unit. (Def.'s LR 56.1(a) Stmt. ¶ 61.) The notification said her transfer was contingent on "meeting all position qualifications criteria, includ[ing] but not limited to training, receiving a recommended training [sic] on the psychological battery and passing the urine screening." (Id., Ex. 18, 7/29/02 Letter to Flanagan from Vaughan.) When plaintiff asked why she had to have another psychological evaluation, she was told that it was the County's practice to require any employee who had been out of a weapon-carrying unit for a year or more to undergo such a test before being transferred back in. (Id. ¶ 59.)

In August 2002, plaintiff had a psychological evaluation. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 66.) Later that month, she was told that she had not passed the evaluation, and thus, would be transferred out of the Probation Unit to a non-weapon carrying unit. (Def.'s LR 56.1(a) Stmt. ¶¶ 65, 67.)

Dr. Diane Goldstein, the psychologist who evaluated plaintiff, said she withheld a positive recommendation on plaintiff pending the County's investigation of plaintiff's complaints about her treatment during the requalification process. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 70-71.) Goldstein also said that she suggested the County send plaintiff back for another evaluation after its investigation was complete. (Id. ¶ 71.) The County did not, however, send plaintiff back to Dr. Goldstein for a follow-up evaluation. (Pl.'s LR 56.1(b) Stmt., Ex. 8, Goldstein Dep. at 80.)

Today, plaintiff remains employed by the County in a non-weapon carrying unit. (Id., Ex. 1, Flanagan Dep. at 209-10.)

## Discussion

In her second amended complaint, plaintiff alleges that the County discriminated against her on the basis of her sex and race when it: (1) refused to requalify her to carry a weapon in 2000, precipitating her transfer to the Domestic Violence Unit; (2) delayed her transfer from the Domestic Violence Unit to the Probation Unit from November 2001 until August 2002; and (3) transferred her out of the Probation Unit in August 2002 because it deemed her psychologically unfit to carry a weapon. The County says that the first category of claims are beyond the scope of her EEOC charge, which states:

> I was hired by the Respondent on February 16, 1999. I am employed as a Probation Officer. In mid November 2001 Respondent informed me that I would not receive a transfer to Division 5. On or about August 5, 2002, I was transferred to Division 5. On August 27, 2002, I was informed that I would be transferred from Division 5, effective August 28, 2002, and I would be assigned to Division 7, which will result in a corresponding reduction in pay.
>
> I believe that I have been discriminated against on the basis of my race, Black, and sex, female, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Def.'s LR 56.1(a) Stmt., Ex. 1, EEOC Charge.)

The Court disagrees. Though plaintiff "cannot bring claims in [this] lawsuit that were not included in her EEOC charge," a claim can fall within the scope of a charge without being explicitly mentioned in it. Cheek v. Western & S. Life Ins. Co., 31 F.3d 497, 500 (7th Cir. 1994). A claim falls within an EEOC charge "if there is a reasonable relationship between the allegations in the charge and the claims in the complaint, and the claim[s] in the complaint can reasonably be expected

to grow out of an EEOC investigation of the allegations in the charge." Id. Such is the case with the claims arising from the 2000 weapon qualification process. The only reason plaintiff was seeking a transfer back to the Probation Unit in November 2001 was because of the County's allegedly discriminatory administration of the weapon requalification tests the previous year. Though not mentioned in her charge, the weapon qualification claims are so closely related to her discriminatory transfer claims that they would inevitably have grown out of the EEOC's investigation into plaintiff's charge. Consequently, the scope of the charge doctrine does not bar them.

Even if they are within the scope of the charge, the County says that the weapon qualification and transfer delay claims, which are based on conduct that occurred more than 300 days before plaintiff filed her charge on August 28, 2002, are time-barred. See 42 U.S.C. § 2000e-5(e)(1) (stating that Title VII claimants must file a charge with the EEOC within 300 days of the allegedly discriminatory event to preserve their right to sue). Plaintiff contends that those claims are saved by the continuing violation doctrine.

The continuing violation doctrine "is designed to accommodate plaintiffs who can show that there has been a pattern or policy of discrimination continuing from outside the limitations period into the statutory limitations period, so that all discriminatory acts committed as part of this pattern or policy can be considered timely." Hardin v. S.C. Johnson & Son., Inc., 167 F.3d 340, 344 (7th Cir. 1999) (internal quotation marks, alterations and citation omitted). Our court of appeals recognizes three kinds of continuing violations. The first arises when the unlawful conduct, like a hiring decision, "takes place over a period of time, making it difficult to pinpoint the exact day the 'violation' occurred." Stewart v. CPC Int'l, Inc., 679 F.2d 117, 120 (7th Cir. 1982). The second

arises when there is an "express, openly espoused policy [that is] alleged to be discriminatory." Id. at 121. The third arises when there is a pattern of covert conduct such that the plaintiff only belatedly recognizes its unlawfulness. Id.

Plaintiff's weapon requalification and transfer delay claims do not fall into any of those categories. Rather, plaintiff seems to be arguing that because she continued to feel the effects of the discrimination she suffered during the 2000 weapon requalification process until August 2002, when she was finally transferred into the Probation Unit, the County's Title VII violation continued until that point. But continuing violation theory contemplates that some illegal activity occurred within limitations period. Hardin, 167 F.3d at 344. In this case, the only event that occurred during the limitations period is the transfer delay. That delay may have perpetuated the effects of the earlier discrimination, but there is no evidence to suggest that it was independently discriminatory.[2] Because there is no evidence that plaintiff suffered discrimination – as opposed to the effects of discrimination – during the limitations period, continuing violation theory does not apply. See Dasgupta v. University of Wis. Bd. of Regents, 121 F.3d 1138, 1140 (7th Cir. 1997) ("[A]n untimely Title VII suit cannot be revived by pointing to effects within the limitations period of unlawful acts that occurred earlier.").

Thus, plaintiff preserved these claims only if she filed timely EEOC charges on them. The record establishes that she did not. It is undisputed that plaintiff failed at her last attempt to requalify on August 16, 2000 and, as a result, was transferred to the Domestic Violence Unit on October 10,

---

[2] Though plaintiff says three non-black or male employees were transferred into the Probation Unit before her (Pl.'s LR 56.1(b) Stmt., Ex. 1, Flanagan Dep. at 194-95), the County says those transfers were approved months before plaintiff became eligible to transfer (Def.'s LR 56.1(a) Stmt., Ex. 33, Vaughan Dep. at 147-49), an explanation that stands unrebutted.

-8-

2000. (Pl.'s LR 56.1(b)(3)(A) Stmt. ¶¶ 36, 44.) That transfer was a "discrete discriminatory act" on which an EEOC charge could reasonably have been based. National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002). Because plaintiff did not file an EEOC charge within 300 days of that transfer, her weapon requalification and delay of transfer claims are time-barred.

That leaves plaintiff's claims that she was discriminatorily transferred out of the Probation Unit in August 2002. Having no direct evidence of discrimination, plaintiff must satisfy the McDonnell Douglas burden-shifting method of proof if she is to defeat the County's motion on these claims. To do so, she must first establish a prima facie case of discrimination. Chiaramonte v. Fashion Bed Group, 129 F.3d 391, 396 (7th Cir. 1997) (citations omitted). Once established, the prima facie case creates a rebuttable presumption of discrimination. Id. at 398. The burden of production then shifts to the County to articulate a legitimate, nondiscriminatory reason for the challenged employment decision. Id. If the County carries its burden, the presumption of discrimination disappears and plaintiff must show that the proffered reasons for the challenged employment decision are merely a pretext. Id.

To establish a prima facie case on her claims, plaintiff must show that she: (1) is a member of a protected class; (2) she was meeting the County's legitimate expectations; (3) she suffered an adverse employment action; and (4) the County treated similarly situated employees outside the protected class more favorably. Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc., 254 F.3d 644, 650 (7th Cir. 2001) (sex discrimination); Foster v. Arthur Andersen, LLP., 168 F.3d 1029, 1035 (7th Cir. 1999) (race discrimination). The County contends that plaintiff cannot make a prima facie case on these claims because the evidence establishes that she did not meet its legitimate expectation

that she be psychologically fit to carry a weapon, a requirement for employment in the Probation Unit.

Plaintiff admits that the County did not deem her qualified to carry a weapon, but contends that the qualification process itself was discriminatory. According to plaintiff, the County: (1) does not require all employees who have been out of a weapon-carrying unit for one year to submit to a psychological evaluation before being requalified; and (2) does not deem unqualified all employees whose psychological evaluations have inconclusive results. In other words, she says that the County's expectations were not actually legitimate. When a Title VII plaintiff argues that the defendant's expectations are illegitimate, the issues of legitimate expectations and pretext merge. See Brummett v. Lee Enter., Inc., 284 F.3d 742, 745 (7th Cir. 2002) (if legitimate expectations are themselves pretextual, the prima facie case is subsumed into the question of pretext). Thus, we will analyze them together.

There is some evidence to suggest that the County selectively enforces its psychological evaluation rule. Donna Vaughan, the County's Director of Human Resources, and James Cunningham, its Assistant Chief, testified, respectively, that "an[y] individual" and "any officer" who has been out of a weapon-carrying unit for a year or more must submit to a psychological evaluation before they will be returned to a weapon-carrying unit. (Pl.'s LR 56.1(b) Stmt., Ex. 2, Cunningham Dep. at 33; id., Ex. 4, Vaughan Dep. at 116.) Yet, it is undisputed that Guy Wilson, an African-American male,[3] was not required to undergo any psychological testing before he

---

[3] Plaintiff asserts that Wilson is white because he "appears" to her to be white. (See 6/25/04 Flanagan Aff. ¶ 5.) Plaintiff's belief about Wilson's race, however, is immaterial. What matters is what the County believes. According to Human Resources Director Vaughan, the County believes Wilson is African American. (See 6/15/04 Vaughan Aff. ¶ 3.)

returned to a weapon-carrying unit[4] after a two-year hiatus. (Id., Ex. 5, Wilson Dep. at 6-8, 23-24; Def.'s LR 56.1(a) Stmt., Exs. 24 & 25, County Weapon Policies.)

There is also evidence to suggest that the County treated plaintiff differently than another officer whose psychological evaluation had the same results. Dr. Goldstein, the psychologist who examined plaintiff, testified that she withheld a final recommendation on plaintiff pending the County's investigation into plaintiff's complaints. (Pl.'s LR 56.1(b) Stmt., Ex. 8, Goldstein Dep. at 80-82.) Goldstein also said that she told the County to send plaintiff back for a follow up evaluation after its investigation was complete. (Id. at 80.) It is undisputed, however, that the County did not send plaintiff back to Goldstein for further testing. (Id.) It is also undisputed that Ramon Ibarra, a Hispanic male, received an inconclusive on a psychological evaluation he took while assigned to a weapon-carrying unit. (Def.'s Resp. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 72.) Unlike plaintiff, however, Ibarra was sent back for a follow up evaluation, instead of being deemed unfit to carry a weapon. (Id.)

Taken together, that evidence is sufficient to raise a genuine issue on the legitimacy of the County's requirements that plaintiff take and unqualifiedly pass a psychological exam before being eligible to transfer to a weapon-carrying unit.

But the record does not suggest that plaintiff received different treatment because of her race. Plaintiff has no evidence to suggest that the County has a pattern of treating African-American

---

[4] The County says there is no evidence to suggest that the Skokie Investigations Unit, where Wilson spent his two-year hiatus, is a non-weapon carrying unit. The County's weapons policies, however, which plaintiff cites, state that only sworn personnel assigned to Intensive Probation Supervision, Home Confinement, Intensive Drug Program, Sex Offender Program and Gang Intervention Unit shall be authorized to carry firearms. (Def.'s LR 56.1(a) Stmt., Exs. 24 & 25.) Thus, it is reasonable to infer, given its absence from that list, that the Skokie Investigations Unit is a non-weapon carrying unit.

employees less favorably than employees of other racial or ethnic groups or that any of her supervisors harbors anti-black sentiments. The only evidence plaintiff has offered to support an inference of racial discrimination is that Ibarra, who is Hispanic, was sent for a follow up psychological evaluation when his first evaluation was inconclusive. Standing alone, however, the fact that the County treated one non-black employee differently than plaintiff does not suggest that its actions were racially motivated. Consequently, plaintiff has not raised a triable issue of fact on her race discrimination claim.

The situation is different, however, for her sex discrimination claim. There are some facts in the record, like those concerning plaintiff's June 2000 attempts to requalify, that suggest the County may have treated her differently because of her gender.[5] It is undisputed, for example, that remedial weapon training and requalifying shoots are generally done on the same day and that practice shoots are generally not scored. (Def.'s Resp. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 15, 30.) It is also undisputed that plaintiff received remedial training from Petrone on June 19, 2000 and that he gave her passing scores on two rounds. (Id. ¶ 20.) After she shot the first passing round, plaintiff says, Petrone told her he could not believe a woman could shoot so well and instructed her to shoot again. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 18.) Moreover, there is no dispute that after plaintiff shot, and Petrone scored, a second passing round, Petrone told her that the day's rounds were only practice and she would have to take her qualifying shoot on another day. (Def.'s Resp. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 20.)

---

[5]Though plaintiff may not recover damages for her time-barred claims, she may "us[e] the prior acts as background evidence in support of [her] timely claim[s]." Morgan, 536 U.S. at 113.

On June 27, 2000, plaintiff made two more attempts to requalify under Petrone's supervision. (Def.'s LR 56.1(a) Stmt. ¶ 26.) Plaintiff says she scored 80% on each attempt, while Petrone said she scored 68% and 48%, respectively on those rounds. (Def.'s LR 56.1(a) Stmt. ¶ 27; Pl.'s LR 56.1(b)(3)(A) Stmt. ¶ 27). There is no dispute, however, that Petrone scored the rounds by counting the bullet holes in the silhouettes at which plaintiff shot, that he refused to give plaintiff those silhouettes "because they were property of the County" and that there is no policy forbidding instructors from giving silhouettes to officers after they have been scored. (Def.'s Resp. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 19, 25-26.) It is also undisputed that Assistant Chief Cunningham said he independently scored the silhouettes, after obtaining them from Petrone, and agreed that plaintiff had failed. (Id. ¶¶ 32-33.) Petrone, however, said that he discarded the silhouettes after grading them. (Id. ¶ 34.)

Cunningham's apparent ratification of Petrone's alleged conduct is not the only evidence that suggests plaintiff's gender may have motivated the treatment she received. Plaintiff testified, for example, that Cunningham, on more than on occasion, made comments about her physique. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 79, 81.) Moreover, one of plaintiff's supervisors, Everett Harris, heard Cunningham say plaintiff has "a nice big butt" and has heard many female employees complain that Cunningham is overly flirtatious.[6] (Id. ¶¶ 83-84.) These facts suggest that Cunningham may have viewed plaintiff more as a sex object than a probation officer, and thus, treated her differently than her male counterparts.

---

[6]The County contends that this evidence is inadmissible hearsay. Because plaintiff does not offer the out-of-court statements for the truth of the matters asserted, however, the hearsay rule does no bar them.

Though it is not overwhelming, the evidence offered by plaintiff is sufficient to raise a triable issue of fact on her claim that she was transferred out of the Probation Unit in 2002 because of her sex. The County's motion for summary judgment on that claim is, therefore, denied.

## Conclusion

For the reasons set forth above, defendant's motion for summary judgment is granted as to: (1) plaintiff's discrimination claims related to the 2000 weapon requalification process and her consequent transfer out of the Probation Unit; (2) plaintiff's discrimination claims related to the November 2001 to August 2002 delay in her transfer back into the Probation Unit; and (3) her race discrimination claim related to her 2002 transfer out of the Probation Unit. The County's motion is denied as to plaintiff's sex discrimination claim related to her 2002 transfer out of the Probation Unit, which is the only claim that remains in this suit.

**ENTER:**

_____
UNITED STATES DISTRICT JUDGE

DATED: __JUL 12 2004__